UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MARÍA PALERM RINCÓN; MARÍA CHAPEL PALERM; CARLOS CHAPEL PALERM;<br><br>**Plaintiffs,**<br><br>vs.<br><br>DOCTORS' CENTER HOSPITAL SAN JUAN; DR. JUAN C. CRUZ CRUZ; CONJUGAL PARTNERSHIP constituted between DR. JUAN C. CRUZ CRUZ and Jane Doe Cruz; CORPORATIONS X, Y, Z; PROFESSIONAL PARTNERSHIPS X, Y, Z; INSURANCE COMPANIES X, Y, Z;<br><br>**Defendants.** | CIVIL NO. 3:19- cv- 1074<br><br>**PLAINTIFFS DEMAND TRIAL BY JURY** |

## COMPLAINT

**TO THE HONORABLE COURT:**

**COME NOW** plaintiffs through their undersigned attorneys and very respectfully **STATE, ALLEGE AND PRAY:**

**I.   JURISDICTION AND VENUE**

1.1   The Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1331, inasmuch as the present action is brought in accordance with the provisions of 42 U.S.C.A. §1395dd, et seq.

1.2   Venue in this district is proper pursuant to 28 U.S.C.A. § 1391 since the claims asserted in this action arose in this judicial district.

1.3   This Court has supplemental jurisdiction over all causes of action arising under the

Constitution and laws of the Commonwealth of Puerto Rico, specifically 31 L.P.R.A. 5141 and 5142, and 31 L.P.R.A. § 3142, as established by 42 U.S.C.A. § 1395dd, and by 42 U.S.C.A. § 1367(a) inasmuch as all claims stem from the same nucleus of operative facts.

1.4     In accordance with the provisions of 28 U.S.C.A. § 1332, the Plaintiffs demand trial by jury.

1.5     Plaintiffs on their own behalf and as heirs of the causes of action of their deceased husband and father, Carlos Chapel García, bring a cause of action against Doctors' Center Hospital San Juan that arises under the provisions of the Emergency Medical Treatment and Active Labor Act ("EMTALA") 42 USC §1395 (1994) (Amended 1997), as to which they invoke federal question jurisdiction pursuant to 28 U.S.C. sec. 1331, and supplemental jurisdiction under 28 U.S.C. sec. 1367, over the claims arising under Puerto Rico law against Doctors' Center Hospital San Juan Hospital and all codefendants in as much as these claims are related to the EMTALA claim, and form part of the same case or controversy under Article III of the United States Constitution.

**II.    THE PARTIES**

2.1     Co-plaintiff María Palerm Rincón is of legal age, and resident of San Juan, Puerto Rico, is the widow and heir of the deceased Carlos Chapel García with whom she had constituted a conjugal partnership.

2.2     Co-plaintiff María Chapel Palerm is of legal age, and resident of San Juan, Puerto Rico, is the daughter and heir of the deceased Carlos Chapel García.

2.3     Co-plaintiff Carlos Chapel Palerm is of legal age, and resident of Bayamón, Puerto Rico, is the son and heir of the deceased Carlos Chapel García.

2.4     Upon information and belief Doctors' Center Hospital San Juan is an entity duly organized in accordance with the laws of the Commonwealth of Puerto Rico and is a Medicare participating facility which owns and/or operates emergency departments at its facilities in San Juan Puerto Rico.

2.5     Co-defendant Dr. Juan C. Cruz Cruz, his wife Jane Doe Cruz, and the conjugal partnership formed between them, are citizens of the Commonwealth of Puerto Rico. Doctor Cruz is an emergency room physician who provided treatment to the deceased Carlos Chapel García on January 28, 2018, at the emergency room of Doctors' Center San Juan.

2.6     Co-defendants Corporations X, Y, Z are entities organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in the said Commonwealth of Puerto Rico, which provided services to Doctors' Center Hospital and were the employer and/or contractor of co-defendants Dr. Juan Cruz Cruz and unknown defendants, and/or in some way benefited from the negligent acts and/or omissions of its agents or employees that in some way intervened with the patient.

2.7     Co-defendants Professional Partnerships X, Y, Z are entities organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in the said Commonwealth of Puerto Rico.

2.8     Co-defendants Insurance Companies X, Y, Z are the insurance companies which provided medical malpractice coverage to co-defendants at the time of the events and is an entity organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in the said Commonwealth of Puerto Rico.

## III.    ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

3.1     On January 28, 2018, at around 11:20 AM, Mr. Carlos Chapel García, 90 years old,

was brought to the emergency room at Doctors' Center Hospital San Juan by ambulance after suffering a fall from a two step ladder in his home.

    3.2    The ambulance personnel found him on the floor and documented cervical trauma, right side and shoulder trauma and acute right back pain for which Toradol 60 mg. IM was given.

    3.3    According to the medical record initial triage was started at 11:50AM.

    3.4    According to the medical record, at 11:58 AM, Mr. Chapel had B/P of 132/76, pulse rate of 71 with regular and nomal rhythm, respiratory rate of 18 and 100 % O2 sat. pulse oximetry.

    3.5    According to the record at 12:20 the patient was evaluated by the ER physician who documented complaints by patient of hip and neck pain and placed orders "stat" for cervical Spine AP- lateral, chest for ribs, hip and pelvis and at 1:01 PM a CT Scan of brain- head w/o contrast. His impression was syncope, collapse, head injury, neck pain; he also described the patient as alert, oriented in person, time and place.

    3.6    Mr. Chapel had also complained of ear pain to the ER personnel.

    3.7    According to the record an EKG was ordered and interpreted with no ST elevations and RRR; the EKG was not included in the records produced to plaintiffs.

    3.8    Laboratory tests ordered and performed revealed WBC 13.3(H), Neut. 83.1(H), CPK-MB 9.8(H), Troponin less than .012.

    3.9    The cervical spine x-ray could not exclude fracture or subluxation and a CT Scan of the neck soft tissue was ordered by co-defendant Dr. Juan Cruz Cruz at 3:54 PM, which was interpreted as showing a "compression fracture with collapse of the C5 vertebral body of uncertain age probably chronic, <u>evaluation by MRI recommended</u>. No retropulsed fragments," which was dictated at 5:58 PM and signed at 6:01 PM by the radiologist.

    3.10    The recommended MRI evaluation was not performed.

3.11   A thorough neurological examination was not performed.

3.12   While in the ER, Mr. Chapel continued complaining of severe neck pain, for which pain medications were given, could not hold his neck straight and remained lying down on a stretcher.

3.13   According to the record co-defendant Dr. Juan Cruz at 7:04 PM instructed the patient to repeat CBC in next 24 hours to monitor WBC levels which were 13.1 most likely from inflammatory process and not true infection, and gave him prescription for CBC in 24 hours and Neurontin, all to be done as out patient.

3.14   Despite being aware of a compression fracture with collapse of C5 vertebra of uncertain age on a 90 year old patient, suffering acute symptoms after a very recent fall and being unable to straighten his neck, with severe pain with difficulty walking, Dr. Cruz and the hospital personnel proceeded to discharge him home without further testing, nor evaluation, nor observation, nor immobilization of the neck.

3.15   Specialists were not consulted, and despite the patient's family insisting on doing further workup and keeping him under observation, they were told that there was nothing wrong with Mr. Chapel and all he needed was rest.

3.16   According to the record, at 7:27 PM Mr. Chapel was discharged home, unable to walk, and had to be transported in an ambulance.

3.17   Despite having diagnosed a C-5 spinal fracture, in the presence of acute symptoms, the hospital physicians and personnel did not provide Mr. Chapel with the necessary tests to identify the cause of his symptoms and/or condition, nor provided him with the necessary stabilizing treatment despite the hospital counting with the resources.

3.18   Doctors' Center Hospital's medical and paramedical personnel departed from its own established protocols for the assessment, diagnosis, monitoring and treatment of patients with Mr. Chapel's presentation which caused that he be discharged home in an unstable condition, without adequate stabilization treatment, putting him at risk of further neurological deterioration, as actually happened.

3.19   The hospital did not provide the appropriate medical screening that it gave to other patients with substantially similar symptoms, nor did it provide the stabilizing treatment required by the applicable protocols and the standard of care.

3.20   As a result of the inadequate and disparate treatment given by Dr. Juan Cruz and the hospital personnel, premature discharge and their failure to provide stabilizing treatment, Mr. Chapel's neurological condition continued deteriorating.

3.21   While at home Mr. Chapel continued with severe pain, progressive difficulty walking and losing strength in his extremities for which on February 1, 2018, he was taken back to the Emergency Room at Doctors' Center Hospital San Juan in an ambulance.

3.22   According to the record triage was performed at 4:17 in the ER and the nurse documented B/P 99/33, pulse 81, respirations 19. The nurse documented complaint of weakness and episodes of disorientation and low blood pressure.

3.23   At 4:40 PM the ER physician started evaluation of Mr. Chapel, documenting severe pain (5-6 intensity) difficulty walking, weakness. Motor sensory deficit, alert and oriented in person, time and place.

3.24   According to the record, the ER physician discussed case with Dr. Jamil Rivera, Orthopedic surgeon, who recommended patient be admitted for surgery next day.

3.25   According to the record Mr. Chapel was placed in cervical collar and admitted to a

room in the hospital at around 11:00 PM.

3.26    A Spinal Cervical and Brain MRI performed at 7:10PM was interpreted at 17:58 PM: among the impressions in the report were 1. Subacute ischemic infarct of the right cerebellar hemisphere; 2. Compression fracture of C5 vertebra with retropulsed fragment and osteophytes producing severe spinal canal stenosis with possible venous congestion and enlargement of the cervical cord at the level with no definitive ischemic infarct at the present time or myelomalacia and no evidence to suggest spinal cord edema; 3. Bilateral severe mastoiditis.

3.27    According to the record, the critical findings in the report were reported to neurologist and spine surgeon Dr. Jamil Rivera, within 10 minutes of observation.

3.28    Consultations were placed to Internal Medicine, Surgery, Neurology.

3.29    Shortly after admission Mr. Chapel started to evidence deterioration and became hypotense and tachypneic requiring inotropic and oxygen support, was very unstable for which ICU admission was ordered and pneumology and cardiology consultations were placed.

3.30    Around 1:28 PM on February 2, 2018, the pneumologist documented, paraplegia, atrial fibrillation. hypoxemia, dependent on oxygen, hypotension on dopamine, uncontrolled diabetes mellitus and need for ICU transfer.

3.31    Around 2:10, the neurologist noted quadriparesis, cervical MRI compatible with cord compression, awake, alert and follows commands and intact cranial nerves and diagnosed quadriparesis secondary to cervical cord compression.

3.32    According to the record, on February 2, 2018, Mr. Chapel was seen by orthopedic surgery service.

3.33    The surgeon documented that the MRI showed C5 fracture with retropulsion and canal stenosis of 5mm; C5 fracture with severe cord compression and quadriplegia; patient with

bradycardia, poor respiratory drive and sensation only to C5 level.

3.34    The surgeon also documented that patient needed a C5 corpectomy with decompression, and that due to chronicity of compression neurological improvement was guarded. At the time, surgery consultant also noted that time of intervention is critical, for which the patient was taken to surgery same day.

3.35    Mr. Chapel was taken to surgery room at 3:15 PM.

3.36    Dr. Jamil Rivera performed a C5 corpectomy, anterior spinal fusion with interbody cage C4C5C6; anterior instrumentation.

3.37    His post-operative diagnosis was C5 fracture with spinal cord injury. As gross findings Dr. Rivera reported unstable fracture C5 with severe cord compression, absent motor evoked (MSEP) and sensory evoked potentials (SSEP) at lower extremities.

3.38    According to anesthesiology notes, before incision Mr. Chapel had motor evoked potentials in upper extremities without sensory evoked potentials; and no motor nor sensory evoked potentials in lower extremities.

3.39    Mr. Chapel was then transferred to ICU.

3.40    After the surgery, Mr. Chapel remained in the ICU, dependent on mechanical ventilation, with hypotension dependent on intropin and during the course of his hospitalization continued to deteriorate, suffering multiple complications, which included a cardiac arrest and neurogenic shock/spinal shock, bradycardia, pneumonia, among others.

3.41    Mr. Chapel never recovered movement of his extremities and continued with hemodynamic and neurological deterioration, developed sacral ulcers until he died on February 22, 2018.

3.42    Throughout his hospitalization Mr. Chapel remained with intact cortical and cranial

nerves, and was described as alert, following commands and responding to pain.

3.43    After the surgery, Dr. Jamil Rivera, the orthopedic surgeon told the family members that if surgery had been performed when he first went to the ER (January 28), Mr. Chapel would be walking.

3.44    Before his fall, Mr. Chapel had a full and active life, was totally independent, ran errands for his children and grandchildren, drove to the post office every day and to his office where his children still worked; enjoyed boating and the company of friends at the club, dancing and sharing with his family.

3.45    Mr. Chapel was the victim of multiple violations of hospital protocols, both as to assessment, screening, monitoring, treatment, stabilization and transfer or discharge home of patients with his symptoms and evident emergency medical condition.

3.46    Mr. Chapel's unstable condition when discharged home was limb and life threatening.

3.47    Mr. Chapel was also the victim of multiple violations of the standards of medical care by the physicians and paramedical personnel of Doctors' Center Hospital San Juan.

3.48    All co-defendants are jointly and severally liable to plaintiffs under Articles 1802 and 1803 of the Puerto Rico Civil Code for their torts and negligent acts and omissions, which departed from the standards of medical care and treatment recognized as adequate by the medical profession in light of the modern means of instruction, education and communication, and directly caused and/or contributed to Mr. Chapel's damages and demise as well as to injuries suffered by all plaintiffs.  The conjugal partnership of any codefendant is also liable inasmuch as it benefited from his actions.

3.49    The medical treatment given to Mr. Chapel at Doctors' Center Hospital San Juan was one of evident apathy and disregard for his well-being and of abandonment on the part of Doctors' Center Hospital San Juan's physicians and the hospital personnel; there was a lack of monitoring, negligent, inadequate, inappropriate and disparate screening and treatment as well as lack of analysis and evaluation of his conditions, thus delaying corrective surgery, inhibiting and/or eliminating any possibility of recovery and causing his quadriplegia and neurological deficits with the complications that he developed and his premature death. Doctors' Center Hospital San Juan's multiple departures from its own protocols and from the standards of medical care, amounted to violations of EMTALA provisions and Articles 1802 and 1803 of the Civil Code of Puerto Rico.

3.50    Plaintiffs still lack complete medical records and protocols and therefore don't have full knowledge of all the facts relevant to the medical malpractice nor to the EMTALA violations which caused the damages and premature death of Mr. Chapel and plaintiffs' damages.

3.51    During his hospitalizations Mr. Chapel was treated by the physicians, nurses and paramedical personnel of Doctors' Center Hospital San Juan and they are therefore jointly liable to plaintiffs for their negligent acts and/or omissions under the provisions of Articles 1802 and/or 1803 of the Puerto Rico Civil Code. Doctors' Center Hospital San Juan Hospital is also liable to plaintiffs for the violations of the EMTALA provisions by its medical and paramedical personnel.

3.52    Mr. Chapel's damages and untimely death was caused by Doctors' Center Hospital San Juan's violations of the screening, stabilization and transfer provisions of EMTALA and/or the negligent and/or late treatment that was given to him by all codefendants. Had it not been by all these violations and the tortious and negligent acts, errors and omissions of all co-defendants his damages and his death, as well as plaintiffs' damages could have been avoided.

3.53     As a result of the inadequate and disparate treatment given by codefendants and hospital personnel Mr. Chapel suffered irreversible spinal cord injury, quadriplegia, neurologic deficits, neurogenic shock and resulting complications, further deterioration and death.

3.54     Plaintiffs also estimate that none of the co-defendants displayed the care nor the cautionary measures that a prudent and reasonable man would in such circumstances, thus not offering Mr. Chapel the medical attention that was due to him.

3.55     Codefendant Dr. Juan Cruz Cruz was grossly negligent in his treatment and/or lack thereof.  To wit: failure to diagnose and implement corrective treatment in a timely manner; failure to order and/or follow up on adequate diagnostic tests; for discharging him home without adequate diagnostic treatment; for discharging him home prematurely, for not providing any stabilization treatment for his spine fracture; for causing further neurologic deterioration; for a substandard evaluation of his symptoms; for not placing the necessary consults, for discharging him home in an unstable condition; for not providing the patient with necessary consults and treatment to correct and stabilize his condition.  His negligent acts, errors and omissions directly caused and/or contributed to the damages, deterioration and death of Mr. Chapel.

3.56     Co-defendant Dr. Juan Cruz Cruz's acts and omissions also resulted in inappropriate and disparate screening and/or discharging the patient without stabilization treatment in violation of the EMTALA provisions, which directly caused and or contributed to Mr. Chapel's damages, deterioration and death.

3.57     Co-defendant Doctors' Center Hospital San Juan is also liable for the negligent and inadequate medical treatment given to the patient by its medical and paramedical personnel, including Dr. Juan Cruz Cruz and unknown codefendants; for the delayed and/or lack of implementation of diagnostic and therapeutic orders by its personnel; for allowing practices in the

management of the patient in violation of its own protocols and of the best practice of medicine; for discharging him home without adequate diagnostic treatment; for discharging the patient home prematurely, for not providing any stabilization treatment for his spine fracture; for causing further neurologic deterioration; for a substandard evaluation of his symptoms; for negligent interpretation of diagnostic tests; for not placing the necessary consults, for discharging him home in an unstable condition; for not providing the patient with necessary consults and treatment to correct and stabilize his condition; for its failure to provide Mr. Chapel with qualified and capable physicians and nurses; for the delay in providing corrective and lifesaving surgery and treatments. The negligent acts, errors and omissions of their medical, technical, administrative and paramedical personnel directly caused and/or contributed to Mr. Chapel's damages, deterioration and death; who had arrived at the Hospital with a condition that was treatable.

3.58    Co-defendant Doctors' Center Hospital San Juan is also liable to plaintiffs for the acts and omissions which resulted in violations of the EMTALA provisions by all co-defendants which directly caused and or contributed to Mr. Chapel's damages, deterioration and death.

3.59    Co-defendant Insurance Companies X, Y, Z is directly liable to plaintiffs because of its contractual relationship with its insured co-defendants as their insurer.

3.60    The Professional Partnerships X, Y & Z are entities formed by the co-defendant physicians with other partners whose identity is at this moment unknown to plaintiffs and who benefited from the tortious acts of the codefendant partner; said entity and its unknown partners are therefore jointly and severally liable to plaintiffs.

3.61    Corporations X, Y, Z are entities whose identities are unknown to plaintiffs at this moment, which was in some way benefited by the tortious acts of one or all co-defendants and/or ordered or in any way had something to do with their tortious actions.

3.62    Plaintiffs' damages were directly caused by the violations to EMTALA provisions and/ or all codefendants' negligent acts, errors and omissions.

3.63    As a direct consequence of the violations to EMTALA and defendants' negligence herein described plaintiffs María Chapel and Carlos Chapel have suffered and will forever suffer enormous damages and emotional anguishes, loss of enjoyment of life, psychological injuries and severe depression for their father's immobility, immense suffering and premature death. They request as compensation a sum of not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) for each of them.

3.64    As a direct consequence of the violations to EMTALA and defendants' negligence herein described, the widow, plaintiff Mrs. María Palerm, has suffered and will forever suffer enormous damages and emotional anguishes, loss of enjoyment of life, psychological injuries, loss of consortium, and severe depression for her husband's immobility, immense suffering, and for the premature death of her lifetime companion. She requests as compensation a sum of not less than ONE MILLION  DOLLARS ($1,000,000.00).

3.65    Plaintiffs, also inherit Mr. Chapel's causes of action for the pain and suffering that he underwent, including the intense physical and emotional pain, emotional anguishes, loss of enjoyment of life, immobility, anxiety and fear of death, as a direct consequence of the violations to EMTALA and defendants' negligence herein described. For these damages they request a sum of not less than ONE MILLION DOLLARS ($1,000,000.00).

3.66    Plaintiffs also claim economic damages incurred related to medical treatment and equipment, funeral expenses, all amounts paid by any medical insurance company and or Medicare as Secondary payers, and other economic damages. For these damages they estimate and request a sum of not less than TWO HUNDRED THOUSAND DOLLARS ($200,000.00).

Case 3:19-cv-01074-DRD   Document 1   Filed 01/25/19   Page 14 of 14

Complaint
Page 14

3.67 All of the above named defendants, herein, are jointly and severely liable to plaintiffs for the actions and/or omissions for which this complaint is filed.

**WHEREFORE**, plaintiffs respectfully request from this Honorable Court to:

1. Grant a judgment against co-defendants for the sums herein requested together with pre-judgment interests, costs and reasonable attorney's fees.

2. Grant plaintiffs such other relief, as it may deem proper and necessary under the circumstances.

3. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs also hereby request a trial by jury in this action.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 25th day of January, 2019.

<u>**S/Rafael E. García Rodón**</u>
**RAFAEL E. GARCÍA RODÓN**
**USDC NO. 129911**
Banco Popular de PR Bldg.
206 Tetuán Street
7TH Floor, Suite 701
San Juan, PR 00901-1815
Tel. (787) 722-7788
Fax (787) 722-7748
E-mail: rgrlaw@gmail.com